Ms. Davidson Good morning, Your Honors, and may it please the Court. I am here on behalf of the appellant, Mr. Hoang, in regards to the ceremony judgment that was granted at the trial court level in favor of the appellees. Speak up a little bit, please. So the issues that we're here for today are whether the trial court erred in granting the summary judgment for the defendant. Within that issue is whether the plaintiff overcame the defendant's alleged legitimate non-discriminatory reason for the reduction in forced termination. Well, one of the non-discriminatory reasons is that your client received the lowest scores among the three managers. Yes, Judge. So . . . Is that a legitimate reason? We say no because that was based on subjective factors that were ultimately rooted in bias or discrimination based on the evidence that the plaintiff showed. So going to that point, the prior reduction force actions that had been done at this company had all been financially based or site closures, things of that nature, and those were typically the process was very objective. In this case, the new supervisor of Mr. Hwang added new factors that were purely subjective. Well, HR agreed with him, right? They allegedly had some sort of hand in the oversight, but he made the factors and then he did the ratings and he made the ultimate decision. Could you list those factors quickly to remind us? Sure. One of them was flexibility, right? Right. Job flexibility, knowledge and understanding of the new Agile system that they were trying to implement, the importance of the, you know, importance and support of the system. They claimed that he didn't support the system at all and was trying to undermine it. What does that mean? So . . . Does that mean team spirit? I would assume team spirit and cooperation in helping move the system and implement it along. So his previous supervisor, in his performance review, he had two supervisors input and his previous supervisor stated he understood the system, was working towards it, was helping implement and then the new supervisor, of which we are complaining about, kind of said the opposite. And that's exactly what he told the EEOC, that he didn't understand it, didn't want it and wasn't cooperating. So you've kind of got conflicting supervisor testimony on this issue. So ultimately, the objective factors, whether or not they would have ultimately ended up in his reduction of force, to your point Judge Smith, the subjective factors completely overruled that. And just had a huge hand in whether or not he and the other . . . I guess I'm trying to follow you because it sounds like you said one of the, the evaluation of one of what you would call the objective factors, because I thought you said the first evaluation was objective and then there were some things added by the new supervisor that were subjective. Is that what you're saying? Sorry, no Judge. It was actually one of the subjective factors, or goes to one of the subjective factors, was whether or not she supported and ultimately worked towards that system, which was one of the subjective ratings. So both of the supervisors had something different to say on what was that subjective factor, if that makes sense. Prior to the new supervisor, just to clarify, prior to that supervisor, their reduction of force process was mostly objective. It was the new supervisor who came in and added on these new subjective factors. So the performance review was talking about the subjective factors. Well, he added subjective factors. How is it that he got a good rating on a subjective factor? After he added the subjective factors, another supervisor gave him a good rating under the new subjective factors. So my point is that the subjective factors didn't exist prior to the new supervisor. They were objective. They were all objective. And then the new supervisor came in, added the new subjective factors to why they should do a reduction in force. And so I don't know his thought process on why he chose those factors, but his factors ultimately were written on paper by both supervisors. The previous supervisor didn't. Does that make sense? I didn't know if I was explaining that correctly. I don't know if I understand it, but... Okay. I can try to make it clear. Let me just do a quick timeline just to try to clarify. So prior to the new supervisor, there was a reduction in force plan in place that was based on objective factors. There already was before the new supervisor came in? Yes. They had a reduction in force process that contained... Oh, a process, but they hadn't decided to use it, right? Right. Not in this context. That's critical. Right. So then the new supervisor comes in. He decides that he wants to do a reduction in force unilaterally, I might add, which is another point we can get to in a second. But instead of using the process that had already been used before and in existence at the company, he added new subjective factors, several, right? So then that is what he ultimately used to terminate the plaintiff as well as another... Who did interviews of Mr. Wong and the other fellows? Sorry. I missed the first part. Who conducted interviews of Mr. Wong and the other two junior supervisors, we'll call them? When they were hired, initially? We're not communicating very well, are we? There were three... There was Wong and two other fellows who were the systems fellows for this quality control, right? Right. So to implement the RIF, they had to interview those three, right, and compare them and Mr. Wong bottomed out. All right. Who conducted those interviews? The new supervisor, Mr. Sheffield. Solely? I believe the HR representative may have been involved. I'm not sure to the extent if he was asking questions or if he was there for all the interviews. Well, normally in some of these cases, you have a committee that's doing such interviews and that's why I was asking whether it was one person or the committee. From the evidence that I've seen in the record, it seems that Mr. Sheffield was... There wasn't a committee to directly answer your question. It was Mr. Sheffield who had what appears to be a minimal input from the HR person, Mr. Bondy, I believe his name is. But ultimately, Sheffield started this, interviewed everyone, rated them, and then ultimately decided to terminate Mr. Wong. Now, it's important to know what basis Mr. Wong is saying this is pretextual. What kind of discrimination does this amount to? He is claiming it is based on his national origin and his age, and I just wanted to quickly just say the 1981 race claim is no more, so we're just focusing on these two. Okay. Now, national origin is, on its face, hard to credit since Mr. Sheffield's boss was Vietnamese, and that Vietnamese boss had been working with Mr. Wong before Sheffield came into the organization. Right? Are you talking about Mr. Tran? Yes. Okay, so Mr. Tran actually was below Mr. Sheffield. She recommended him for the job, but he actually recommended him to be his boss, so actually Mr. Sheffield was above Mr. Tran. All right, but nevertheless, it's very difficult to suggest, and this idea that Sheffield didn't know that a man named Wong, Tom Wong, was Vietnamese or that he was discriminating against him because he was Vietnamese, I mean, that just doesn't make sense to me. So generally, I think the reason why we have the burden shifting, which just kind of goes to my second issue, which I can talk about in a second, is that direct evidence is hard to come by on what someone thinks, right? Like for example, I think it's a reasonable jury could potentially see that while he may have had a buddy or a friend or maybe even a colleague in the same national origin that recommended him for this job, that does not mean he does not have a bias against that same national origin. Well, there's a print, there's a, well, we'll get to that in a minute, but so in the company hierarchy then, where did Tran stand vis-a-vis Wong? She was beneath him, actually. So it was Mr. Tran was on the kind of engineer, I'm going to say worker B level, and then you've got the three managers, which was the appellant, one of the three, and then Mr. Sheffield was over those. Interesting. Yes. So Mr. Tran recommended Mr. Sheffield to be not one but two levels above him, actually. Okay. Is there additional discovery that you're claiming you need or basically all of the facts in the summary judgment record that we have? No, I don't think any discovery needs to be, any additional discovery needs to be added, Your Honor. All right, so suppose, suppose that we were to agree with you here, I'm not saying whether we will or we won't, and suppose this case went to trial tomorrow, what evidence are you going to show as to national origin or age discrimination? Is it, will we find it in the, we'll find it in the summary judgment record, right? You will absolutely, Your Honor, both in the motion for summary, the response to the motion for summary judgment as well as the appellant's brief when we're talking about the pretext talks about 14 kind of categories or separate pieces of evidence that show discrimination. But to be fair, if you're asking specifically about national origin, there's some that tie to both age and national origin. So, like if we were going to separate the two, I don't have a specific. Okay, so what's the smoking gun? What would be, you have the jury in the box and you're going to bring on your star witness or your star documents to establish national origin discrimination. What would that show? Specifically national origin, you mean? Right. Okay. That's a very good question. Um, I think, I think the, a really, really good piece of evidence is the statistical analysis of done by the, done by the expert. Another good piece, I think. What does that statistical analysis show? So it shows that if, if you took the entire team at random, because the whole team, not just the managers, were subject to the reduction in force, um, it would be 1.something, 1.14% that it, that the two people that you fired would be in two, not one, but two of the same protected classes. It's, it would be. In other words, two Vietnamese guys were fired? Two, two Vietnamese, um, over 40 year old men were fired with the same last name. And no one else. No one else. Right. So I think that's, you know, and to go back, you know, it's, like I said, I think it's, I think it's, I think it would not be unreasonable for a jury to say, okay, he's got maybe a friend or someone he knows that's in this category, but that doesn't mean he's not biased. Right. Whether he acknowledges or not. Whatever. Um, so then, just really quickly, I just wanted to touch on, um, the second issue, and just, um, you know, the, the summary judgment was granted, um, essentially because the, the trial court weighed the evidence, which is in the province of the jury, that's what the jury is supposed to do. Um, you know, it's the judge, the judge can obviously at the trial court level weigh credibility or even further, further back, you know, whether it's admissible, um, or even discoverable, but to weigh the evidence and then discount it or even completely disregard it, um, is, is outside the, the trial court judge's purview. Um, so I think that's a really, that's a really big problem that the judge has completely just discounted, um, evidence and weighed it. Um, you know, that's why we've got, we've got juries. But, um, anyway, I, to, to end here, I, I just think that a reasonable jury could conclude that my client was discriminated against on one or more basis since he had two, um, in light of all the evidence, and, um, I think this case should be reversed with a summary judgment. Okay. Thank you. You have a chance for rebuttal. May it please the court, Mark Kosicki, Ogilvie Defendants, on behalf of, uh, appellees here, defendants below, Micro Semicorporation and Microchip Technology, um, I'd like to start by thanking the court for the opportunity to appear in person, uh, and argue the case. May it please the court. I want to make, uh, or at least address two points, uh, subject to the court's questions. The first is that the prima facie case that a plaintiff is required to show is a meaningful part of every discrimination case, and it's inappropriate to simply assume it away in our rush to get to the real meat of the case in judging the, the employer's proper reason for an employment-related decision. The reason for that is because it generates a presumption of intentional discrimination, and that presumption of discrimination has to be based upon a rational showing. That's the likely reason that the plaintiff was subject to whatever adverse action is being complained about. Secondly, Your Honor, and the district did its job and correctly concluded the plaintiff had not established a prima facie case. Secondly, uh, the, the 14 categories of pretext evidence that, that the plaintiff offered, um, are simply not evidence at all. Uh, they are, uh, conjecture and speculation, um, irrelevant, uh, or, or the type of evidence that this court, uh, had evaluated and concluded was inadequate to show pretext in its decision in Equal Employment Opportunity Commission versus Texas Instruments, which Your Honor, Judge Jones authored and Judge Smith, uh, joined. In that case, the Equal Employment Opportunity Commission offered the same types of evidence, including statistical evidence, uh, and this court simply rejected, uh, refused to consider that as meaningful evidence, um, because it failed to consider the actual reasons and factors. Now, turning back to the prima facie case, uh, uh, the reason it's so important to keep in mind is the reason it was created by the Supreme Court. And I'll quote from the court's decision in, uh, in Bergeen. The PFC serves an important function. It eliminates the most common non-discriminatory reasons for the plaintiff's rejection. However, the prima facie case raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. And we are willing to presume this largely because we know from our experience that more often than not, people do not act in a totally arbitrary manner without underlying reasons, especially in a business setting. Thus, when all the legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not that the employer, who we generally assume acts only for some reason, based its decision on an impermissible consideration of those factors. In a typical discharge case, the presumption or inference of discrimination makes perfect sense because the plaintiff has to show they were adequate. I think we're well familiar with the general background and purposes and so on. Would you get to the facts, please? Yes, Your Honor. In our case, as the court held with respect to the plaintiff's prima facie case, there was no evidence that established the fourth factor. When a person's position is eliminated, they're selected for RIF. The plaintiff failed to identify any evidence that suggested the reason he was selected as opposed to the other automated test manager who was—I'm sorry, manual test manager, Mr. Samaya, who he compares himself to. He provided no evidence that suggests that there was either a racial, national origin, or age-based reason. Well, here's what I was thinking about this. National origin doesn't make a whole lot of sense to me, but until Mr. Sheffield came in, there was no reduction in force. The previous manager had not contemplated a reduction in force. He had complimented Mr. Wong. I forget whether he gave him a bonus, but he gave him some form of recognition about the good work that he had done, and in fact, he'd had a career of 27 years with the company. New guy comes in. New guy surveys the territory. Oh, we're going all automated. Oh, I can do this quicker with fewer people. Suddenly, he creates a reduction in force applicable to only one part of the company. Normally, when we see RIFs, they are governed by financial considerations, and they apply throughout the company. I'm not saying they can't be footed on other bases, but it's unusual. He creates this RIF. Then he specifically works with the HR. Let's think of some criteria here. Then he comes up with criteria like flexibility, knowledge and understanding, system support. Frankly, flexibility is a well-known code word for age discrimination, and system support sounds like team spirit to me. All of a sudden, Mr. Wong is at the bottom of the ratings. Is he being RIFed because he cussed at Mr. Sheffield one time, or is he being RIFed because he was the oldest one among these three guys who got terminated? Why can't a jury decide? Your Honor, there's no evidence sufficient for a jury to reach that conclusion. He didn't get fired because he cussed at the manager. I have to correct Your Honor on that. It was actually Mr. Sheffield who cussed at Mr. Wong. Oh, well, then. The evidence that exists is undisputed that Mr. Sheffield was hired specifically because of his automated testing experience as a manager at Hewlett Packard. They didn't like each other. Again, that's the background to what a jury might think is a pretextual RIF to get rid of Mr. Wong, who's the oldest guy on the team. Your Honor, for a jury to reach that conclusion, there has to be some evidence establishing a nexus. This is what you wrote about in the EEOC . . . I know exactly what I've written in previous cases, and I'm trying to look at the facts here. I've also gotten reversed by the U.S. Supreme Court when we move too fast on a summary judgment, so I'm trying to be careful. Understood, Your Honor. Plaintiff's speculation is what he is relying upon, and irrelevant evidence that is insufficient to create any inference or suggestion that age or national origin was the reason for Mr. Sheffield's . . . Let me understand this. Did Sheffield devise these new categories of evaluation and assessment? Sheffield came up with those? Your Honor, I have to correct that as well. The category of flexibility was one that was in this company's standard RIF practice. It's undisputed. According to the former HR director, who's no longer employed at the time he testified, he explained that in every RIF the general practice needs to be refined, and the assigned HR person, in this case Lisa Manzo, works with the relevant manager, in this case Mr. Sheffield, to identify particular criteria that the manager is trying to get at in terms of selecting the most appropriate person. Now, this did not start out as a RIF, Your Honor. The undisputed evidence established . . . Let me just . . . I just want to stay on this for a minute. So, there weren't any new categories developed post-Sheffield? So, under the practice, in terms of evaluating the general categories, what specifically gets evaluated for the particular situation in the job elimination is unique to that job and unique to the reason for that . . . why they're doing the elimination. So, those specific criteria were developed along with some of the other criteria, like seniority that was established. All right. And then nobody took any kind of a written exam or anything? No, no. So, Sheffield interviewed these three people? So, Your Honor, there was no interview. Mr. Sheffield . . . He observed them? He observed. And he scored them based on his observations? Correct. All right. And, he did that, however, not because he wanted to conduct a rep. He concluded that he did not need two manual test engineering managers. He went to HR saying, I don't need two of them. And, HR said, well, if you're going to . . . are you going to hire somebody else? No. In that case, you have to follow our RIF practice. That wasn't Mr. Sheffield's approach. He simply went to HR and said, I don't need two manual test managers. And, what do I do? HR concluded, you have to go through this practice and you have to comparatively evaluate the three people who hold the same job title, even though Mr. Sheffield had concluded he needed one of two manual test managers. The HR director, Mr. Bondy, told him you have to consider everyone who has the same job classification and reports here. It was Mr. Bondy's approach and conclusion that a RIF practice had to be a follow-up. But, Sheffield had decided that he only needed one. Yes, Your Honor. And, I can only speculate that at the moment he decided he only needed one, he decided which one he was going to get rid of if he could do it without a RIF. But, then he was told, and I'm not saying he said to anybody which one I want to get rid of, but he was told you've got to use this RIF process in order to reduce it to one. Yes, Your Honor. And, that's what he did. Yes. He used the process. All right. That was the process. Which Human Resources was involved at every step. They looked at the criteria. They looked at the purpose for what he was trying to accomplish, which was eliminate one manager position. It's clear he made the correct decision in terms of eliminating a position. They've never hired another automated test manager. Well, maybe the other guys just have to work a whole lot harder now. Perhaps that's the case, Your Honor, but there's no doubt. He got rid of the troublemaker. He got rid of the old inflexible guy. Well, Your Honor, the person he eliminated was somebody who has not contradicted Mike Tran's testimony that he told Mike Tran, Mr. Wong, the plaintiff told Mike Tran, that he did not support automated testing, did not support increasing its use in the QA group because he did not think it was as good as manual testing, which was his historic background. There were two incidents that plaintiff points to as evidence of discrimination. Both of them involve situations of a conflict between Mr. Tran and Mr. Wong, the plaintiff, in which Mr. Sheffield sided with Mr. Tran. The first one was where Mr. Tran spent almost two weeks of his time trying to generate test results that Mr. Wong's engineering team had provided. And after finally spending all this time in which the plaintiff was aware of and saw the emails back and forth, the plaintiff told him, well, the data really wasn't supposed to be presented as final. Both Mr. Tran and Mr. Sheffield were very upset about that. There's no inference of any kind of discrimination, and the plaintiff doesn't contest the basic underlying facts. As a matter of fact, in the incident where Mr. Sheffield told plaintiff this has got to effing stop, it was because plaintiff had made a comment that both Mr. Tran and Mr. Sheffield concluded was attacking Mr. Tran for having communicated directly with the customer. Mr. Sheffield responded negatively to that. The plaintiff does not dispute the underlying facts. Well, he could have fired him because he didn't cooperate, right? Your Honor, I think that— I mean, this may be a case where bringing HR into the mix and creating a pretextual riff is evidence of something. Well, Your Honor, it's not evidence of any kind of age discrimination or national origin discrimination. To reach that conclusion, there has to be something that suggests that selecting person A over person B is caused by— Well, how long had the two Indian fellows been working for the company? How old were they? So Mr. Shadraksan was located in India, and he had been a manager for approximately three years and worked for a contractor as a manager before the company brought in that group. So he was telecommuting from India? No, Your Honor. He just—he works and lives—he's an Indian citizen. Oh. Not eligible to work in the United States. Right, but okay. And how old? I believe he was 37, Your Honor. He was outside the protected class. Mr. Sumaya, who is the other automated test engineer, was within the protected class but 12 years younger than the plaintiff. There are no age-related— That's typically viewed as evidence that's sufficient to imply the possibility of but-for causation, right? No, Your Honor. That's the case if somebody is adequately performing in a regular termination case. They're adequately performing their job. They've established that. And they're terminated nonetheless despite adequately performing their job, and they're replaced by somebody substantially younger. That's not the standard when it's not a situation of one person adequately doing their job but nonetheless terminated. Here you're just picking between two people. Well, I don't—what's your best case for drawing that distinction? I don't understand that because if he were a black guy and there were three of these middle managers and you terminated the black guy and didn't replace him, he could have a case, right? If he could provide some other evidence . . . You don't have to show that the person was replaced if he was fired under circumstances that are called a writ. As this court has held in Palo Solto, if they have not replaced, then they have to provide other evidence demonstrating that discrimination, whatever the type is, was relevant to the analysis. Well, and, you know, theoretically, as again, I'm just testing. He's 58. One guy is 46, and the other guy is 37. So, Your Honor, the reason the inference exists on the prima facie case is because it's more likely than not that the defendant acted for a discriminatory motive. That's what the PFC establishes. In a writ case where someone's not replaced, you've got two people adequately performing their job. Selecting between one or the other does not make it more likely than not that discrimination was the motive. And that's a presumption that goes to a jury, Your Honor. There has to be something more. I guess I'm dumb. I'll go back and look at Palo Solto. I just don't quite understand that comparison. And, Your Honor, this court has addressed that standard previously, but it's never clearly articulated what a plaintiff needs to prove in a reduction in force or position elimination situation. But it needs to be something more. And the plaintiff doesn't have any evidence. As the Texas Instrument case pointed out, the plaintiff's case failed because the plaintiff failed to establish any nexus between age discrimination and the decision. The court flatly rejected the statistician's report because it did not consider the factors or relative skills and abilities of the people being evaluated, which is what the RIF was intended to produce. But the plaintiff has not established a nexus. He's established, I fit in a protected classification, and I was selected and somebody else wasn't. That is not enough even to establish a PFC, but it's certainly not enough to overcome undisputed evidence that Mr. Sheffield was hired to drive the agile manufacturing and crease-automated testing, the evidence that he followed the practice, he concluded he only needed one manual test engineer, that he had issues with Mr. Wong based upon Mr. Wong's disputes with Mr. Tran, and Mr. Tran is the reason Mr. Sheffield was hired by Microsemi. He used to work for him for many, many years. And at Microsemi, when the position became available, he recommended him. The company hired him to be Mr. Tran's boss. If the mere fact that— Aren't you arguing on one—I mean, just one more question. Aren't you arguing on the one hand, didn't you say something about a RIF being based on reducing from three to two managers on the basis that all three of them are performing okay? Yes, Your Honor. But on the other hand, you're saying, well, he really had it in might be too strong, but he preferred not to work with Wong because of these other problems. You don't need a RIF to fire somebody because they can't get along in the organization. And the company concluded, the HR director concluded that the RIF— Why can't a jury decide whether all that is pretextual? Because, Your Honor, there's no reasonable conclusion that can be drawn from most of the evidence, which is undisputed, establishing that Sheffield had legitimate reasons for why he did it. He made a correct conclusion that he did not need two automated—or, I'm sorry, manual test managers. That's proven by the fact that they never hired anyone else. And there's no age-related comments, no stray comments suggesting age. There's no indication whatsoever that creates a nexus between the fact that Mr. Sheffield selected Plano for his termination. I appreciate that, Your Honor. Okay. Thank you. Okay, Ms. Davidson. So I just wanted to quickly reiterate a couple key points that are in the record. First, you know, this emphasis they put on the program was so important. Three and a half years after the plaintiff was terminated, they still didn't implement the program. Another pretty important point is that—so the three subjective factors, I'll list them. Sheffield created depth of Agile understanding. That's the new system. Agile system engagement and implementation. And then there was a flexibility category previously, but he added a subcategory to the flexibility portion called, you know, Sheffield admitted that these were all subjective, that he created them, and Hoang was the only one that received the lowest rating, which is a one in that category, over the other two. Another thing that I wanted to point out is that he was not the only one terminated in this rift. Like I said, before the other person terminated was also of Vietnamese descent, and he was 53, where Hoang was 58. So something happened where the only two people terminated here in this reduction of force were in two of the same protected classes. This is enough to take to a jury to decide whether, just like you said, Judge Jones, whether this was pretextual or whether this was truly, you know, on the up and up, for lack of a better term. And again, I wanted to mention that the plaintiff, before he was, you know, let go, he was there for a long time. He received promotion after promotion. He received raises. He received, you know, he had more responsibilities. He got a bunch of different employees underneath him. And then when he was terminated, all of that was absorbed into just one of the other managers. But in sum, those are kind of my basic rebuttal points. But I think that the plaintiff has satisfied his burden to get this issue in front of a jury to decide. So for the RIF, in fact, the number of employees has been reduced and has stayed that way, right? Or at least had stayed that way as of the time of the summary judgment. The timing for the summary judgment, I'm not for sure. But they actually, that team actually did add 44 new people who were, I believe they were all . . . We just evaluate, you know, the judgment and the record that we have. We don't look at things that might have happened later. So as far as you know, it in fact was a RIF because the number of employees in this area was reduced and it stayed that way. Is that right? Actually, so after he was terminated, 44 new people were hired. And they were all younger than the plaintiff. 44, I mean . . . Right, right. So there was a two-person layoff in this specific department and then 44 were hired on. All right, but as to this specific . . . we're just going around and around about this. There should be an easy answer. As to this specific department, in fact, it was a RIF because the number was decreased. Right, no one was replaced within that department. You're correct, Judge. All right. That's it. Thank you. All right, thank you, ma'am.